IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF KANSAS,

J.R.G.,[1]

                Plaintiff,

Vs.                                                                           No. 19-2706-SAC

ANDREW M. SAUL,
Commissioner of Social Security,

                Defendant.


MEMORANDUM AND ORDER

This is an action reviewing the final decision of the defendant Commissioner of Social Security ("Commissioner") that denied the claimant J.R.G.'s Title II application for disability insurance benefits protectively filed on June 17, 2016. The application alleged an onset date of April 6, 2016. The application was denied, initially and on reconsideration, and a hearing before an administrative law judge ("ALJ") ended with a denial of benefits. The Appeals Council denied a request for review, so the ALJ's decision stands as the Commissioner's final decision. The claimant seeks to reverse and remand the decision for an award of benefits. The plaintiff's original brief, and Commissioner's response brief have been filed. The plaintiff was given a second extension of time to file a reply, and that deadline has passed

---

[1] The use of initials is to preserve privacy interests.

without a filing. ECF## 13 and 14. The court considers the case ripe for judicial review.

**STANDARD OF REVIEW**

To qualify for disability benefits, a claimant must establish that he or she was "disabled" under the Social Security Act, 42 U.S.C. § 423(a)(1)(E), during the time when the claimant had "insured status" under the Social Security program. *See Potter v. Secretary of Health & Human Services*, 905 F.2d 1346, 1347 (10th Cir. 1990); 20 C.F.R. §§ 404.130, 404.131. Disability is defined as unable "to engage in any substantial gainful activity by reasons of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). And, "[a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, . . ., engage in any other kind of substantial gainful work which exists in the national economy. . . ." 42 U.S.C. § 423(d)(2)(A). The Commissioner is to make this severity determination by considering "the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. § 423(d)(2)(B).

The court's standard of review is set forth in 42 U.S.C. § 405(g), which provides that the Commissioner's finding "as to any fact, if supported by substantial evidence, shall be conclusive." The court also reviews "whether the correct legal standards were applied." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (citation omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Wilson v. Astrue*, 602 F.3d 1136, 1140 (10th Cir. 2010) (internal quotation marks and citation omitted). "It requires more than a scintilla, but less than a preponderance." *Lax v. Astrue*, 489 F.3d at 1084 (citation omitted). "The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." *Id.* (internal quotation marks and citation omitted). The review for substantial evidence "must be based upon the record taken as a whole" while keeping in mind "evidence is not substantial if it is overwhelmed by other evidence in the record." *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009) (internal quotation marks and citations omitted). In its review of "whether the ALJ followed the specific rules of law that must be followed in weighing particular types of evidence in disability cases, . . . [the court] will not reweigh the evidence or substitute . . . [its] judgment for the Commissioner's." *Lax*, 489 F.3d at 1084 (internal quotation marks and citation omitted). Findings will not be affirmed by

3

isolating facts and labeling them as substantial evidence, for the court must scrutinize the entire record to assess the rationality of the Commissioner's decision. *Graham v. Sullivan*, 794 F. Supp. 1045, 1047 (D. Kan. 1992).

**ALJ's DECISION**

The ALJ employed the following five-step sequential evaluation process (20 C.F.R. § 404.1520) for determining a disability application. ECF# 3-1, p. 17. First, it is determined whether the claimant is engaging in substantial gainful activity. Second, the ALJ decides whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments which are "severe." At step three, the ALJ decides whether the claimant's impairments or combination of impairments meet or medically equal the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ at step four determines the claimant's residual functional capacity ("RFC") and then decides whether the claimant has the RFC to perform the requirements of his or her past relevant work. Step five of the process has the ALJ determine whether the claimant is able to do any other work considering his or her RFC, age, education and work experience. For steps one through four, the burden rests with the claimant to prove a disability that prevents performance of past relevant work, but the burden shifts to the Commissioner at step five. *Blea v. Barnhart*, 466 F.3d 903, 907 (10th Cir. 2006).

In his decision, the ALJ found for step one that the "claimant has not engaged in substantial gainful activity since the alleged onset date of April 16, 2016." ECF# 3-1, p. 18. For step two, the ALJ found that the claimant's only severe impairment was "status post right rotator cuff repair." *Id.* As for his hypertension, hyperlipidemia and vertigo, the ALJ found that the prescription medicines had effectively treated these conditions and were keeping them under control. As for the amputated fingers on his right hand, the ALJ noted the claimant had worked for several years after the amputation without any follow-up care or any noted limitation by a medical provider. At step three, the ALJ found that the "claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments." ECF# 3-1, p. 19. The ALJ determined at step four that the claimant had the RFC "to perform light work . . . in that he can lift and carry 20 pounds occasionally and 10 pounds frequently, sit for 6 hours out of an 8 hour workday and stand and walk for 6 hours out of an 8 hour workday." *Id.* The ALJ added these limitations--occasionally climb ladders, ropes, and scaffolds; occasionally crawl; no overhead reaching with right arm; and avoid heights and moving machinery when unprotected. *Id.* The ALJ's step four conclusion was that the "claimant is capable of performing past relevant work as a transition tester." ECF# 3-1. p. 22. Consequently, the ALJ found that the plaintiff was not disabled.

**ARGUMENTS**

A.   <u>RFC Finding Unsupported by Substantial Evidence</u>

    1.   <u>Failed to identify weight given to Dr. Vani's opinion on 10/10/16</u>

Claimant injured his right shoulder during a fall. After seeing his primary care physician for several weeks, an MRI was done in May of 2016 that revealed a rotator cuff tear. Dr. John Vani, orthopedic surgeon, did a right shoulder arthroscopy and "open rotator cuff repair (superior capsule reconstruction)" on June 3, 2016. ECF# 3-1, p. 347. He was seen by a physician's assistant two weeks later who recorded that the claimant had "stopped taking his pain medications a few days ago and is doing well" and diagnosed that he was "doing well two weeks postoperatively." ECF# 3-1, p. 315. He was told to continue wearing a sling for one more week and to begin "physical therapy for passive range of motion." *Id.* As of the middle of July of 2016, claimant had received ten therapy sessions.

On July 18, 2016, approximately six weeks after the surgery, Dr. Vani examined him noting that "we have been going slow due to the superior capsule reconstruction" for "severe cuff tear" but that the shoulder was "doing well." *Id.* at p. 347. Dr. Vani prescribed a treatment plan of continuing "gentle physical therapy" and "periscapular strengthening" and in four weeks "strengthening of the deltoid and cuff." *Id.*

On the next day after his examination, Dr. Vani completed and

signed a medical source statement on claimant's ability to do work-related activities. *Id.* at pp. 358-362. Dr. Vani described the following limitations to exist as of June 3, 2016, the date of the claimant's surgery. *Id.* at p. 362. He noted, in part, that the claimant could carry less than 10 pounds occasionally, could not crawl or climb, was unlimited in fingering and feeling, and was limited in reaching all directions and handling. Dr. Vani wrote in explanation, "no overhead reaching to protect the repair. Also no frequent reaching away from body to protect repair." *Id.* at p. 359. Dr. Vani also imposed a two-pound pushing restriction of the upper extremities "to protect rotator cuff repair healing." *Id.* at p. 360. As fairly read on its face, Dr. Vani's medical source statement addresses the claimant's limitations shortly after the surgery as needed to protect the shoulder while healing.

On August 29, 2016, Dr, Vani examined the claimant noting:

> He is doing well, doing therapy twice a week. He may begin some strengthening since he is now 12 weeks postoperatively. He may begin driving his stick shift mini Cooper automobile. Pushing and pulling restrictions increased to 5 pounds. Followup in six weeks.

*Id.* at 367. Dr. Vani next saw claimant on October 10, 2016, and included in his patient history the following:

> He is unable to return to his usual job and would have trouble with overhead lifting. He is currently taking some classes at KCK cc for HVAC. I think he would be okay on a ladder from a safety standpoint, because the arm would keep him from falling, but I don't think he could lift anything overhead. He would have to do all the lifting from a floor to tabletop or similar position.

7

*Id.* at 414. Under the examination section, Dr. Vani recorded:

> He has excellent passive range of motion basically equal to his other now. The strength is still weak, as expected since he had an unrepairable cuff tear. His supraspinatus is 3-4/5, he can overcome gravity in the scapular plane, but I don't think he could lift one-pound in the scapular plane. The infraspinatus seems slightly stronger to 4/5 but is still relatively weak compared to what is normal. He has a little bit of loss of elbow extension, probably related to the biceps tenodesis. On his other arm, he has a Popeye deformity which allows his elbow to extend fully. It's possible the right biceps tenodesis is overtensioned slightly causing the decreased elbow extension but overall this seems tolerable and may stretch out with time.

*Id.* at 415. As for ongoing treatment, this is Dr. Vani's only recorded note:

> **1. Complete tear of right rotator cuff**
> Notes:   He had a superior capsule reconstruction, and the expected physical therapy for that could go for six months or even longer. I will refill this therapy as needed. I'm going to stop seeing him so often now, and schedule a one-year followup with x-rays. I expect he will continue to improve over the next year. Continue home exercises.

*Id.* This record also shows x-rays as scheduled for June of 2017.

The next medical record from Dr. Vani shows that on June 5, 2017, he examined claimant with this history:

> The patient is a 53 year old male who presents one year status post right shoulder arthroscopy, rotator cuff repair, biceps tenodesis, distal clavicle excision, subacromial decompression on 06/3/16. If he overuses his shoulder, he has pain and weakness. Today, his shoulder is sore due to doing duct work in his basement. However, he states that his shoulder is doing well overall.

*Id.* at 652. As far as the history of the repair, Dr. Vani reviewed x-rays noting, "Impression is improved glenohumeral alignment, and less bony

8

impingement." *Id.* at 653. The treatment notes concluded: "His superior capsule reconstruction is doing well. There is not long-term followup that I am aware of on this procedure. I might schedule any followup, unless he has increased pain or worsening shoulder function. He may use the shoulder as tolerated." *Id.*

The ALJ gave limited weight to Dr. Vani's medical source statement of July 2016, as this opinion was rendered during the claimant's early stage of post-operative recovery and was inconsistent with Dr. Vani's subsequent treatment notes showing improvement. *Id.* at 21. In contrast, the ALJ gave "great weight" to the state agency medical consultant's opinion "that the claimant could perform light work with additional postural and environmental limitations." *Id.* at 21. This medical opinion was given on January 21, 2017, in reliance on Dr. Vani's later examination in October of 2016 and on therapy notes that showed good progress, improved strength, and outdoor activities that included lifting a paddle boat and doing yard work. *Id.* at 77. Dr. Korte further opined, "Although you are unable to work at the present time, due to your continued treatment, it is expected that by 04/15/2017, your condition will have improved enough that you will be able to return to work." *Id.* at 80. The ALJ explained that the consultant's opinion was "consistent with the examination in the record that showed with time to heal his strength and overall functioning improved in his right shoulder. They

9

are consistent with the fact that he did not require any significant ongoing treatment for his right shoulder." *Id.* at 21-22.

Claimant argues that the ALJ "failed to identify the weight of the opinions of Dr. Vani dated 10/10/16," ECF# 7 at p. 14. The ALJ's decision, however, does cite and discuss Dr. Vani's examination notes from October of 2016:

> While the claimant required surgery, it appears that with the surgical intervention his condition improved. Examinations showed gradual improvement in the functioning of his right shoulder. During an examination in October 2016, he exhibited some moderate ongoing weakness in his shoulder (Exhibit 6F, pp. 2,3). He could overcome gravity in the scapular plane, but he did not appear to be able to lift one pound in the scapular plane. Notably, during his most recent examination he showed mild ongoing abnormalities in his shoulder. In June 2017, the gross alignment of his shoulder was normal (Exhibit 9F). . . . Additionally, the claimant reported that his shoulder had improved at that time (Exhibit 9F). He reported some pain, but that was only after he had done some duct work in this home (Exhibit 9F). Furthermore, he has not required any significant ongoing treatment. after his surgery, he required a course of physical therapy (Exhibit 7F). However, he completed this treatment approximately six months after his surgery. He has not required any additional surgical intervention. Nor has he required any injections in his shoulder. Overall, the record is not indicative of him having significant ongoing limitations from this impairment.

ECF# 3-1, pp. 20-21. The claimant overstates the significance of a statement appearing in his patient history section of the October 2016 examination note. Dr. Vani certainly recorded the claimant was "unable to return to his usual job" as part of the history, but he does not reference any source or basis for that statement. It hardly qualifies as a well-supported

medical opinion on the plaintiff's ability to work. Even if it could be so liberally construed, the court remains satisfied that the ALJ's decision adequately reflects consideration of all the medical records and opinions of Dr. Vani and the evaluation of them against all the medical evidence of record and the claimant's daily activities. The court finds that the ALJ's decision articulates specific and legitimate reasons for not giving controlling and ongoing weight to Dr. Vani's earliest opinions through October of 2016 that had restricted claimant's activities to allow for healing after surgery. The medical record shows the claimant's ongoing recovery, improvement through therapy, and increasing daily activities. As of June of 2017, Dr. Vani released the claimant allowing him to use the shoulder as tolerated. The court is satisfied that the ALJ's decision is "sufficiently specific to make clear to any subsequent reviews the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007) (internal quotation marks and citation omitted).

    2.  <u>Failed to obtain updated opinion from Dr. Vani</u>

The claimant complains that the ALJ should not have weighed Dr. Vani's earlier opinions as "outdated" without first obtaining an updated opinion from Dr. Vani. "In choosing to reject the treating physician's assessment, an ALJ may not make speculative inferences from medical

11

reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and *not due to his or her own credibility judgments, speculation or lay opinion.*" *McGoffin v. Barnhart*, 288 F.3d 1248, 1252 (10th Cir. 2002) (quotation omitted; emphasis in original). Rather than speculative inferences of the claimant's improvement, the ALJ's decision is substantially supported by Dr. Vani's own examination records, the therapy notes showing continued improvement in motion and strength, and the claimant's own reports of improvement and accompanying levels of increased physical activity. The ALJ's duty to contact a medical source is triggered when the evidence from a medical source is inadequate for determining disability. *Cowan v. Astrue*, 552 F.3d 1182, 1187 (10th Cir. 2008); *Kruse v. Astrue*, 436 Fed. Appx. 879, 884 (10th Cir. 2011). The medical evidence of record is sufficient here for the ALJ to make a disability determination and to evaluate the medical source opinion given in July of 2016 as limited in duration and purpose to promote healing after surgery. Further, the claimant was represented by counsel at the hearing before the ALJ, and counsel did not request any other development of the record before submission. *Cowan*, 552 F.3d at 1188 ("[W]hen the claimant is represented by counsel at the administrative hearing, the ALJ should ordinarily be entitled to rely on the claimant's counsel to structure and present claimant's case in a way that the claimant's claims are adequately explored." (quoting

*Hawkins v. Chater*, 113 F.3d 1162, 1167 (10th Cir. 1997)).

    3.  <u>Failed to weigh Dr. Korte's opinion properly</u>

The claimant first argues that the ALJ failed to include Dr. Korte's opinion that restricted him from fine manipulation due to the amputation of fingers on his right hand. This restriction was not addressed in his RFC or in the hypothetical posed to the vocational expert. The court does not find any error in omitting this part of Dr. Korte's opinion. The tips from two of the claimant's fingers were amputated in 2011. ECF# 3-1, p. 419. The evidence of record establishes the claimant worked his past relevant employment for years with the amputation. The ALJ found that the claimant's amputation resulted in only "minimal limitations" and that the claimant had a history of engaging in substantial gainful activity despite the amputation. *Id.* at p. 19. The ALJ further noted that claimant had not received any ongoing care for the amputation and that "his providers have not reported limitations in the use of his right hand." *Id.* Substantial evidence supports the ALJ's decision that the claimant could perform his past work despite this amputation, and the failure to include this limitation is not an error requiring reversal and remand.

The claimant also contends the ALJ should not have given "great weight" to Dr. Korte's opinion as it was rendered in January of 2017 and did not include any review of records from examinations occurring later in 2017.

Specifically, the claimant points to the x-rays and treatment for lower back pain. The x-rays showed "[m]ild disc space narrowing within the lumbar spine" and "mild-to-moderate lower lumbar facet arthropathy." *Id.* at 658. The medical records show no treatment for this pain other than the recommendation of an exercise program included back exercises. This evidence does not show an impairment likely to limit the claimant's ability do his past relevant work. The court finds no error in the ALJ's conclusion to give great weight to Dr. Korte's opinion based on the medical evidence of record and the claimant's daily activities.

### 4. Failed to include limitations for vertigo, knee and left arm

The claimant challenges again the ALJ's failure to include limitations for these asserted impairments. As to vertigo, the claimant's treatment records for April of 2017 reveal he was complaining of only some occasional episodes of dizziness with interstate driving. He discontinued his care at that time. *Id.* at 670. And in March of 2018, he told his treating physician that dizziness was "very rare now." *Id.* at 684. The ALJ observed that the claimant's condition was well-controlled with treatment. The ALJ did include in the RFC a limitation to avoid the hazards of unprotected heights and unprotected moving machinery. Substantial evidence supports the ALJ's decision to exclude additional limitations for the plaintiff's vertigo.

As for the knee impairment and left arm impairment, the

14

claimant does not point to what medical evidence was overlooked or should have been considered in making the RFC determination. The court is unaware of what medical evidence shows the diagnosis and treatment for any knee impairment. The records show 2010 rotator cuff surgery on the left shoulder. The claimant worked full time for years at his past relevant work after that surgery despite the left shoulder and arm complaints. The court finds no error in the ALJ's decision to not include any additional limitations for these conditions.

B.  <u>Step Four Findings Flawed and Unsupported by Substantial Evidence</u>

At step four, the ALJ is required to make findings regarding: 1) plaintiff's RFC; 2) the physical and mental demands of plaintiff's past relevant work; and 3) whether plaintiff has the ability to meet the physical and mental demands of plaintiff's past relevant work. *See Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996). "An ALJ can comply with these requirements if he quotes the VE's [vocational expert's] testimony with approval in support of his own findings at phases two and three of the step four analysis. *Boyer v. Colvin*, 2016 WL 1170950, at *7 (D. Kan. Mar. 23, 2016) (citing *Doyal v. Barnhart*, 331 F.3d 758, 760-761 (10th Cir. 2003)).

The claimant argues he described his past work as a cellular migration analyst that involved working on a computer and communicating with employees in the field, and yet, the VE identified his past work as falling

within the category of a transition tester. The claimant disputes that this job classification correlates to his past work because he did use testing equipment. The claimant blames this lack of correlation on the ALJ failing to develop a record on the mental and physical demands of his prior work and on the ALJ deferring to the VE's testimony.

At the hearing, the VE listened by telephone to the claimant's testimony. ECF# 3-1, p. 29. The ALJ asked the claimant to explain his past work which he had held from 2011 to 2016. The claimant described it as a cellular migration analyst that involved speaking with technicians in the field and working on the computer to check network connections and to program if needed. *Id.* at 35. When asked if this was a type of communications technology work, the claimant answered the work was contracted by Sprint "to change out the transmitters throughout the country." *Id.* The claimant explained his employer worked exclusively on the transmitters assuring connectivity before it was put into Sprint's network. *Id.* at 36. The ALJ had the claimant clarify that he only did office work and no field work. The claimant said his job required him to lift or carry "30 pounds maybe." *Id.* The ALJ developed a record of the claimant's other prior work and then asked the VE if she needed any additional information. When asked by his attorney about his difficulties in doing his past work as office tech, the claimant answered:

16

> A.   Probably what I would have now or getting to and from work due to the intermittent vertigo that I have. Me? You feel like you are just so isolated and it last for ten, 15 seconds. When it happens and you are driving you are like it happens once a night on I-35 and you are a car goer. I mean, that's freaking out.
> Q.   Understood.
> A.   It just – having to travel to the job anymore.

*Id.* at 44.

The VE testified that claimant's work as "cellular migration analyst is considered a transmission tester by the DOT" as "light, skilled with an SVP of 7." ECF# 3-1, p. 48. Based on the RFC given in the ALJ's hypothetical, the VE testified that she believed the claimant could perform his work as a transmission tester and as the cellular migration analyst. *Id.* at p. 49. In his decision, the ALJ relied on the VE's opinion that given the RFC and other factors in the hypothetical, the claimant could perform his past relevant work as a transition tester. *Id.* at 22.

The claimant argues the record is insufficient on documenting the physical and mental demands of his cellular migration analyst. He was represented by counsel at the hearing, and it was claimant's burden to show that he was unable to perform his former job. The VE heard all the testimony given by the claimant as to the cellular migration analyst position and gave her opinion as to the DOT classification without a question asked or objection made by claimant's counsel. The ALJ's adoption of the VE's testimony is sufficient to document the ALJ's conclusions because "[a]n 'ALJ

17

may rely on information supplied by the VE at step four.'" *Doyal v. Barnhart*, 331 F.3d at 761 (quoting *Winfrey*, 92 F.3d at 1025). The substance of the ALJ's analysis is sufficiently articulated and explained to sustain the step four analysis in this case. There is no error in the step four analysis.

Substantial evidence sustains the ALJ's conclusions at step four. When counsel asked the claimant what kept him from doing his former job as analyst, his only answer was difficulty in driving to work because of intermittent vertigo. The Commissioner points out that lack of transportation is not considered in determining ability to perform past work. *See Erica U. v. Berryhill*, 2018 WL 6617261, at *4 (W.D. Wash. Dec. 18, 2018) ("The Social Security regulations do not take into account a claimant's ability to get to and from work.")(citing 20 C.F.R. § 404.1566(c) ("We will determine that you are not disabled if your residual functional capacity and vocational abilities make it possible for you to do work which exists in the national economy, but you remain unemployed because of—(1) Your inability to get work.")). The transition tester occupation did not require driving as a job duty. Moreover, the VE testified expressly that based on the RFC and other factors in the ALJ's hypothetical, it was her opinion that the claimant could perform his past work as the cellular migration analyst. *Id.* at p. 49. The court finds substantial evidence on the record as a whole sustains the Commissioner's decision.

IT IS THEREFORE ORDERED that the judgment be entered in accordance with sentence four of 42 U.S.C. § 405(g) affirming the Commissioner's decision.

Dated this  13th day of August, 2020, Topeka, Kansas.


  /s Sam A. Crow_____
 Sam A. Crow, U.S. District Senior Judge